*Municipal Court of the City of Boston*

No. 368161

## WILLIAM J. TERRY, d-b-a

## BOSTON MACHINERY AND TOOL CO.
## AND
## WILLIAMS MACHINE COMPANY, INC.
### v.
## RIVERSIDE TRANSPORTATION CO.

(November 10, 1954.)

*Adlow, J.* This is an action of contract or tort in which William J. Terry, doing business as the Boston Machinery and Tool Company, hereinafter referred to as the Shipper, and the Williams Machine Company, Inc., of Poultney, Vermont, hereinafter referred to as the Consignee, claim damages for injury to a lathe during transit from Boston, Massachusetts, to Poultney, Vermont.

There was evidence that on February 10, 1953, the Shipper sold to the Consignee a lathe that was then located at the plant of the Atlantic Works in East Boston; that upon completion of the sale, the

Shipper arranged with Joseph Sacco, treasurer of the Riverside Transportation Company, and hereinafter referred to as the Carrier, with respect to shipping the lathe to the plant of the Consignee in Poultney, Vermont. Several days before the lathe was transported to Vermont the Shipper saw the Carrier's employees placing skids under it preparatory to its being loaded on a trailer. The skids were six inches wide, eight inches high and forty feet long, and had been put under the legs that hold the bed of the lathe. They had been securely fastened to the machine by lag bolts. This lathe was forty-two feet long overall, with a thirty inch gear. It was made up of head stock, tail stock, bed and legs, the bed being the main casting of the whole body of the machine. This lathe was forty-two feet in length overall, and consisted of two sections; there was a twelve foot section at the tail stock, and a thirty foot section at the other end. Two bolts on each side of the lathe joined the sections where they came together. The bolts had no heads on them but were fastened by nuts on both ends.

The Shipper testified that he telephoned to the Treasurer of the Carrier company and complained that the skids were not heavy enough to support the machine over the road, but that the Treasurer replied that they were heavy enough and that he would take the responsibility for transporting the lathe. There was other evidence to indicate that the Shipper was unhappy about the size of the skids, but that Sacco, the Treasurer, assured him at the time with the words, "I'll take care of it." The lathe weighed about fifteen tons. At the time that the arrangement for the transportation was made with the Carrier, it was expressly agreed that the lathe would be unloaded by the Consignee at Poultney, Vermont.

Pursuant to the arrangement, and after the skids had been attached to the legs of the lathe, the lathe was placed on a trailer which was drawn over the road to the plant of the Consignee in Vermont. The

bill of lading was signed by the Treasurer of the Consignee corporation, while the lathe was still on the trailer and after a representative of the Consignee corporation had examined the lathe. *Thereafter, the employees of the Consignee took complete control of the lathe and proceeded to unload it into the machine shop of the Consignee.*

Thomas Barrington, a rigger in the employ of the Consignee, testified that he examined the machine when it arrived; that there was an overhang of twelve feet of the machine beyond the rear end of the trailer, but that the machine had been reinforced for purposes of transportation by a shoulder which supported a chain which extended to that part of the lathe which overhung the trailer. After the Consignee's agents took control of the situation under the directions of the rigger, Barrington, they proceeded to back the trailer up to the front entrance of the shop and to build a ramp from the rear of the trailer into the shop which ramp would permit the unloading of the lathe. Five or six men assisted Barrington in this task.

The ramp was forty-five to forty-eight feet long: it was made up of cribbing and five by eight inch timbers. It started at the floor of the shop and went up gradually to the height of the trailer platform, which was about four feet. After this, Barrington and his assistants jacked up the lathe six inches or so and put six inch by four foot rollers under it. The rollers were long enough to go under the skids. There were probably five rollers under the lathe on the trailer before they proceeded to unload it. After that, they ran a line from a truck that was backed up to a side door of the shop and the line was brought to the rear of the lathe and fastened about six or eight feet from the end of it. The truck to which this line was attached was started in motion and the lathe was eased out onto the ramp. A set of blocks was hitched to the front end of the lathe and to the front end of the trailer so as to snub the lathe down the

ramp, in this way easing the machine down while on the rollers.

As the lathe moved toward the rear of the trailer, the rollers which the lathe already passed over were removed, and reinserted at the other end. *When all but eight feet of the lathe was off the ramp there was a loud noise and Barrington noticed the lathe sag over a space of about thirty-four feet where the machine was suspended between the ramp and the floor. He then noticed a crack on the side of the lathe.* The noise that he heard was "as if you hit a piece of casting with a big hammer." To relieve the strain on the crack, Barrington took the rollers out from under the head stock and let the lathe down, in this manner eliminating the sag. The next day he made a more careful examination of the lathe and found that three of the four nuts on the two bolts on one side of the lathe which held the two sections together were loose. The other nut on the side where the crack occurred was tight. Barrington had not examined the nuts prior to the time when the crack occurred, nor did he examine the nuts until the day following.

Barrington testified that before unloading the lathe it was necessary to jack it up. This was accomplished by putting timbers in the space between the bottom of the lathe and the top of the skids. These timbers extended out beyond the skids about eight inches, and the jacks were put under the ends of these timbers. When the lathe was jacked up high enough the rollers were put under the skids. He also testified that the first time he saw any crack in the lathe was after he heard the loud noise. It was Barrington's opinion that if ten by ten inch skids were used on the lathe, there wouldn't have been so much sag and that if he had to do the job he would have had a heavier skid under the lathe. He testified that the ten inch by ten inch skid wouldn't be very much stronger or give much more support to the machine.

Barrington testified that in his opinion the crack

was caused by the fact that two of the nuts on the inside and one nut on the outside of the bed were loose, while the upper outside nut was tight, with the result that the strain of the whole machine when suspended over the ramp was on the single tight nut. In his own words, "The weakness happened to be on that one side, so that's why it cracked, it had no support from the other side at all. The one side sustained the load. If the nuts had been tight you'd have both sides for strength." He also stated that "you would depend more on the bed (of the lathe) itself to sustain the weight than you would on the skids at that particular point," and that he depended on the strength of the machine rather than on the skids to withstand the suspension that he anticipated. It was his opinion that the skids wouldn't give unless the machine gave.

A witness, Austin F. Haggerty, who was in the business of repairing castings testified that the type of "crack" that was heard during the unloading of the lathe was consistent with a noise produced by the cracking of cast iron.

Mr. Sacco, Treasurer of the defendant company, the Carrier, testified with respect to the precautions taken by him to insure the safe arrival of the lathe at Poultney, Vermont, and of the expedients resorted to by him to prevent the sliding of the lathe while on the trailer and to reinforce the lathe at the point where the two sections were joined together, as well as to support that part of the lathe which over-hung the trailer. In his opinion the method employed by the workmen of the Consignee in dragging the lathe from the trailer onto the ramp was too direct and abrupt, and in consequence applied too much pressure to the lathe at a time when it was suspended between the rear end of the trailer and the floor of the shop.

In this action both the Shipper and the Consignee joined in one action to recover for the damage caused, and at the close of the evidence the defendant filed requests for rulings, which, in effect, denied that the

evidence warranted a finding for the Consignee in his claim against the Carrier. The court declined to so rule and found for the Consignee. Being aggrieved by the court's refusal to rule as requested, the defendant Carrier brings this report. Not in issue in this report is the refusal of the court to find for the Shipper.

If the undertaking of the Carrier was to unload the lathe at the Consignee's plant, the problem posed by this report would be comparatively simple. Whether we treat the Carrier as a private carrier or as a common carrier, the peculiar circumstances of this case render the distinction immaterial. By virtue of the arrangements between the Carrier and the Shipper, who acted for the Consignee in making the contract of carriage, the undertaking of the Carrier was to deliver the lathe *to the door* of the Consignee's plant, and the Consignee expressly undertook to unload the machine itself. Under the circumstances the duty of the Carrier was to deliver the lathe in the condition in which he received it to the Consignee at the entrance to his plant. His responsibility for it continued until such delivery was effected in good order. *DeMott & Ingersoll v. Laraway,* 14 Wendell, 225. Because there was a clear-cut transfer of control over this lathe when it reached the plant of the Consignee; because the President of the Consignee corporation examined it; and because its Treasurer signed a receipt for it, and paid the freight that was due on it; there can be no question with respect to who had control of the machine at the time the alleged break occurred.

Two theories appear to underlie the plaintiff's claim. The first, that the skids which the Carrier had placed under the lathe were unsuitable for the purpose; the second, that the nuts which held fast the bolts which joined the two sections of the lathe had worked loose and thereby weakened the entire structure of the lathe. The Court has expressly found that the damage was caused by the improper skidding

which was provided by the Carrier for the lathe. Whether the skids were proper or improper is matter of grave doubt in the light of the evidence of the plaintiff's rigger, Barrington, who had charge of the unloading operations. It must be constantly kept in mind in considering the basic issue of the Carrier's responsibility that the break which appeared on the side of the lathe came into being at the time the resounding crack was heard, and that this episode occurred during that phase of the unloading when the plaintiffs' servants were in complete control of the situation and when no one connected with the defendant Carrier was involved in the transaction.

In order to sustain the plaintiffs' claim against the defendant it must appear that a condition for which the defendant was responsible and which imperiled the unloading of the lathe existed at the time, and that the plaintiffs' servants did not know of the condition and were not in a position to know of it. There is ample precedent to support the view that if there is a dangerous condition of which the Carrier should be aware and he delivers the article while this condition exists without informing the consignee of it then the responsibility for the consequences resulting from the transfer of this hazardous condition would rest squarely on the shoulders of the Carrier who thus delivered the goods in this dangerous condition. Under the common law the shipper of goods impliedly undertakes to ship no goods of such a dangerous character or so dangerously packed that the consignee could not by reasonable knowledge be aware of their dangerous character, unless he gives notice to the consignee of this dangerous character. *Transoceanica Societa Italiana D Navigazzione v. H. S. Shipton & Sons*, 1923 1 K.B. 31, 39. However, where the consignee of merchandise is equally situated with the Carrier to recognize defects or faults in the nature of the shipment, he then accepts the goods at his peril and the responsibility for their safe unloading and unpacking is his own.

It has been held that where the owner of a vessel has an opportunity to examine goods that have been loaded on board the vessel no warranty on the part of the shipper of the goods can be implied that they are fit to be carried on the voyage. *Acatos v. Burns,* 3 L.R. Exchequer Division 1878, 282.

In *Thomas v. Day,* 4 Espinasses Reports, 262, where improperly packed goods were delivered to a warehouse and the warehouseman offered suitable slings to the truckmen who refused them, and thereafter, the warehouseman undertook to hoist the goods into the warehouse by the lift and the package broke, the court held that the warehouseman should not have applied his tackle to the goods unless "that could be performed which he was bound to." If the slings were necessary to properly hoist the goods the refusal of the carman to use them will not exempt the warehouseman. "He ought to have insisted on the carman's using them; and if he refused he should have repudiated those goods and refused to accept them." *Thomas v. Day,* supra.

In the instant cause whether the misadventure which resulted in damage derived from improper skids or from loose bolts, the consignee or its agents had ample opportunity to ascertain the correct situation. The defendant undertook to deliver the lathe to the door of the Consignee's plant in the same condition in which he received it, and so far as this report discloses, he performed his agreement. There is no question that the break occurred simultaneously with the loud noise and that this happened while the unloading operations, which the Consignee had undertaken, were in process.

In a situation where the parties stand on an equality so far as knowledge with respect to the facts is concerned, there is no room for any implied warranty of suitability with respect to the apparatus which is available for handling the goods.

*Bamfield v. Goole & Sheffield Trans. Co., Ltd.,* 2 K.B. 1910 94. Having assumed the responsibility

to unload the lathe and having determined the manner and means of unloading it without the collaboration in any respect of the defendant, it ill suits the Consignee now to claim that the damage resulted from a default on the part of the Carrier. *Lewis v. Western R. R. Corp.*, 11 Met. 509, 515; *Merritt v. Old Colony & Newport Ry.*, 11 Allen, 80, 83.

Even if the skids were inadequate, it was in the power of the Consignee when he jacked up the lathe, to employ suitable skids. So many other factors intervened between the time of the delivery to the Consignee and the time of the break that the skid condition became a remote and insignificant factor. *Carter v. Lockey Piano Case Co.*, 177 Mass. 91; *Bratton v. Rudnick*, 283 Mass. 556, 559. The early case of *Thomas v. Day*, supra, clearly indicates that in the known circumstances the clear duty of the Consignee was either to repudiate the tender of delivery because of the improper nature of the skidding that was provided under the lathe, or to accept it and in so doing to assume the responsibility for any consequences in the unloading.

It follows that the evidence in this case did not warrant a finding for the Consignee under the reported circumstances.

*Finding for the plaintiff vacated.*

*Judgment to be entered for defendant.*

Timothy H. Donahue, for the plaintiff.

John P. Regan, for the defendant.